# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>ex rel.,</u><br>ETHICAL SOLUTIONS, LLC,<br>1094 SALTON DRIVE<br>AKRON, OH 44333<br><br>and<br><br>BEVERLY BROUSE<br>1094 SALTON DRIVE<br>AKRON, OH 44333<br><br>Relators,<br><br>      v.<br><br>AKRON GENERAL HEALTH SYSTEM<br>c/o CRAIG M. BABBITT<br>400 WABASH AVENUE<br>AKRON,OH 44307<br><br>AKRON GENERAL MEDICAL CENTER<br>c/o CRAIG M. BABBITT<br>400 WABASH AVENUE<br>AKRON,OH 44307<br><br>PARTNERS PHYSICIANS GROUP<br>c/o CRAIG M. BABBITT<br>400 WABASH AVENUE<br>AKRON,OH 44307<br><br>AKRON GENERAL PARTNERS, INC.<br>c/o CRAIG M. BABBITT<br>400 WABASH AVENUE<br>AKRON,OH 44307<br><br>and<br><br>NHV PHYSICIAN'S PROFESSIONAL<br>CORPORATION<br>c/o CRAIG M. BABBITT<br>400 WABASH AVENUE<br>AKRON,OH 44307<br><br>              Respondents. | Civil Action No.<br>   5:15 CV 2720<br>JUDGE  JUDGE LIOI<br>    MAG. JUDGE BURKE<br><br>COMPLAINT FOR VIOLATION OF<br>FEDERAL FALSE CLAIMS ACT [31<br>U.S.C. § 3729 <u>et seq.</u>]<br><br>JURY TRIAL DEMANDED<br><br><u>FILED IN CAMERA AND UNDER<br>SEAL PURSUANT TO 31 U.S.C.<br>§3730(b)(2)</u> |

2015 DEC 30  PM 3: 57

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
AKRON

FILED

Through undersigned attorneys, *qui tam* Relators, on behalf of the United States of America, for this Complaint against Respondents allege as follows:

## I.  **INTRODUCTION**

1.      This is an action to recover damages and civil penalties, on behalf of the United States Government (the "United States" or the "Government") arising from false and/or fraudulent statements, records, and claims made and caused to be made by the Respondents and/or their agents and employees in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended ("the FCA" or "the Act").

2.      This *qui tam* case is brought against Respondents for knowingly defrauding the federal Government in connection with Medicare, Medicare Advantage plans, Medicaid and other federally funded health care programs.  As alleged below, for at least the past 5 years, Respondents have engaged in a scheme to pay improper compensation to physicians to induce them illegally to refer patients, including Medicare, Medicare Advantage and Medicaid patients, to Respondents' hospital for inpatient and ancillary services.

3.      The compensation offered to physicians as an inducement for referrals includes overall compensation above fair market value.  These referral-driven levels of compensation came in many forms of illegal kickbacks and inducements for patient referrals including, but not limited to, hefty annual salaries far over the fair market value of the services rendered.  The financial relationships between the Respondents and the physicians they employ or contract with implicate the Stark Statute, the federal Anti-Kickback Statute, and various state laws and ethical canons of the medical profession.

4.      Physicians with whom Respondents have entered illegal financial relationships that include unlawful kickbacks refer large volumes of patients, including Medicare, Medicare Advantage and Medicaid patients, to Respondents' hospital and related facilities in violation of

3

federal law. Respondents have and continue to submit false or fraudulent claims based on these referrals to the United States to obtain millions of dollars in Medicare Advantage and Medicaid reimbursement they are not legally entitled to receive. Under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (2009), such claims are false and/or fraudulent because the Respondents have no entitlement to payment for such unlawfully obtained referrals.

5. Further, despite knowing that millions of dollars in payments from the federal government have been received in violation of the Stark Statute's prohibition on receipt of payment for services rendered despite an improper financial arrangement, Respondents have failed to refund these payments as required by the Stark Statute. Under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G) (2009), this constitutes a knowing and improper avoidance of an obligation to transmit money to the Government.

6. To conceal their unlawful conduct and avoid refunding payments made on the false claims, Respondents also falsely certified, in violation of the False Claims Act, that the services identified in its annual cost reports were provided in compliance with federal law, including the prohibitions against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians. The false certifications, made with each annual cost report submitted to the government, were part of Respondents' unlawful scheme to defraud Medicare.

7. Besides Stark and Anti-Kickback violations, Respondents, individually and/or collectively, have engaged in additional illegal practices as set forth herein. These illegal practices include improper billing for services as described below. Because of Respondents' improper practices, the federal treasury has been damaged in a substantial amount.

8. Respondents' conduct as alleged herein violates the federal False Claims Act (FCA).

4

## II.  HISTORY OF THE FEDERAL FALSE CLAIMS ACT

9.      The FCA was originally enacted during the Civil War.  Congress substantially amended the Act in 1986 – and, again, in 2009 and 2010 – to enhance the ability of the United States Government to recover losses sustained because of fraud against it.

10.     The Act was amended in 1986 because Congress found that fraud in federal programs was pervasive and that the Act, which Congress has characterized as the primary tool for combating fraud against the federal Government, was in need of modernization.  Congress intended that the 1986 amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and would encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

11.     Likewise, the 2009 and 2010 amendments were introduced to fill gaps in the coverage of the Act and to correct ambiguities in the drafting and misinterpretations of the intended scope of the Act that had emerged in case law in the over 20 years that had passed since the 1986 amendments.

12.     From the 1986 amendments until May 20, 2009, the FCA prohibited, *inter alia*: (a) "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" and (b) "knowingly mak[ing] us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729 (a)(1)-(2) (1986).

13.     Until May 20, 2009, "claim" was defined under the Act as "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of

the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c) (1986).

14.     As amended in the Fraud Enforcement and Recovery Act of 2009 ("FERA"), the Act now imposes liability upon any person who, *inter alia*:  (A) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment of approval" or, effective June 7, 2008, (B) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729 (a)(1)(A)-(B) (2009).

15.     As amended by FERA on May 20, 2009, "claim" now is defined in the Act as "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2009).

16.     Under the 2009 FERA amendments, a violation of the FCA occurs when any person ". . . knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G) (2009).

17.     The term "obligation" is defined under the Act to include:  "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3) (2009).

18.     Any person who violates the Act is liable for a civil penalty of between $5,500 and $11,000 for each false or fraudulent claim, plus three times the damages sustained by the United States.

19.     The Act allows any person having information about false or fraudulent claims to sue for himself and the United States, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the Respondents during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

20.     Based on the foregoing federal FCA provisions, *qui tam* Relators seek, through this action, to recover damages and civil penalties arising from the Respondents' knowing fraud against the Medicare and Medicaid programs.

## III.   **PARTIES**

21.     Relator Beverly Brouse is a resident of Akron, Ohio. She was employed as Director of Internal Audit at Respondent Akron General Health Systems ("AGHS") until December 17, 2015. In this position, she conducted audits designed to address the compliance of AGHS and its subsidiaries with laws governing kickback arrangements, the physician self-referral prohibition, billing and other areas. As Director of Internal Audit, Relator Brouse reported directly to the Compliance and Internal Audit Committee of AGHS' board of directors. Relator Brouse had been employed at AHGS for 12 years. Prior to working for AGHS, she worked as an internal auditor for University Hospitals for four years and as an operations auditor for KPMG, an accounting firm, for one and one-half years.

22.     Relator Ethical Solutions, LLC is an Ohio limited liability company headquartered in Akron, Ohio.

7

23.     Respondent AGHS is an Ohio non-profit corporation headquartered in Akron, Ohio. AGHS owns Respondents Akron General Medical Center ("AGMC"), Partners Physicians Group, Akron General Partners, Inc. and NHV Physicians Professional Corporation.

24.     Respondent AGMC is an Ohio non-profit corporation headquartered in Akron, Ohio.

25.     Respondents Partners Physician Group ("PPG") and Akron General Partners, Inc. ("AGP") are Ohio non-profit corporations headquartered in Akron, Ohio. Respondent NHV Physicians Professional Corporation ("NHV") was an Ohio non-profit corporation headquartered in Akron, Ohio, which was merged out of existence into PPG on December 31, 2013.

## IV.    JURISDICTION AND VENUE

26.     This court has jurisdiction over the subject of this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

27.     Although such issue is no longer jurisdictional under the 2010 amendments to the FCA, to relator's knowledge, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this complaint, as those concepts are used in 31 U.S.C. § 3730(e). Whether or not such a disclosure has occurred, relators would qualify under that section of the FCA as an "original source" of the allegations. Before suing, relators voluntarily disclosed and provided to the Government the information on which the allegations or transactions in this action are based. Additionally, realtors have knowledge about the misconduct alleged herein that is independent of, and that would materially add to, any publicly disclosed allegations or transactions that may prove to have occurred without their knowledge.

28.     This court has personal jurisdiction over Respondents under 31 U.S.C. § 3732(a). Respondents can be found in and transact substantial business in the District, including business related to Respondents' concerted misconduct.

29.     Venue is proper in the Northern District of Ohio under 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Respondents have engaged in concerted misconduct as alleged herein.  Venue is also proper in this district because one or more of Respondents can be found in and transact business in this District, including business related to Respondents' concerted misconduct.

## V.     APPLICABLE FEDERAL HEALTHCARE PROGRAMS AND LAWS

### A.     The Medicare Program

30.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program.   Medicare is a federally-funded health insurance program primarily benefiting the elderly.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  See 42 U.S.C. § 426 et seq.  The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

31.     Part A of the Medicare Program, the Basic Plan of Hospital Insurance, authorizes payment for institutional care, including inpatient hospital services and post-hospital nursing facility care.  See 42 U.S.C. §§ 1395c- 1395i-4.

32.     Part B of the Medicare Program, the Voluntary Supplemental Insurance Plan, covers outpatient and ambulatory services and services performed by physicians and certain other health care providers, whether inpatient or outpatient.  42 C.F.R. § 410.3.

33.     To assist in the administration of Medicare Part A, CMS historically has contracted with "fiscal intermediaries."  42 U.S.C. § 1395h.  Fiscal intermediaries, typically

insurance companies, handle processing and paying claims and auditing cost reports.  To assist in the administration of Medicare Part B, CMS contracted with "carriers."  Carriers, typically insurance companies, handle processing and paying Part B claims.  Beginning in November 2006, Medicare Administrative Contractors ("MACs") began replacing both the carriers and fiscal intermediaries.  See Fed. Reg. 67960, 68181 (Nov. 2006).  The MACs act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level.  See 42 § C.F.R. 421.5(b).

### 1.  Background on Hospital Reimbursement

34.  Hospitals are reimbursed under Medicare Part A for providing services to inpatients.  Under the Medicare Part B benefit, hospitals may also be reimbursed for providing services to outpatients.  Reimbursement is available under Part B for diagnostic services (those used to determine a diagnosis for a patient such as diagnostic x-rays) and therapeutic services (those that aid a physician in treatment of a patient such as clinic services).

35.  Since 1983, Medicare, Medicare Advantage plans, Medicaid, and other federally-funded health insurance programs have reimbursed hospitals for inpatient care and emergency department encounters through a prospective payment system based on classification of patients through Diagnosis Related Groups (DRGs).  A DRG is a patient classification reimbursement code determined based upon the patient's principal diagnosis, ICD diagnoses, age, sex, treatment procedure, discharge status, and complications or comorbidities.  The objective of these classifications is to reimburse hospitals for providing health care services to a patient based on the patient the hospital is treating and the costs typically incurred by a similarly situated (and reasonably efficient) hospital treating a similarly situated patient.

36.  A growing number of hospitals also offer outpatient services through provider-based" physicians' offices.  Payments to hospitals for these outpatient services are made based

on the Outpatient Prospective Payment System (OPPS). OPPS payments are based on Ambulatory Payment Classification (APC) groups. Services within an APC are similar clinically and require similar resource use. "Addendum B," published by CMS, lists all HCPCS/CPT codes and the APC, status indicator, national payment amount, and coinsurance amount assigned to each code. The APC payment amount, often known as the "technical component" or "facility fee," like DRG payments, is separate from, and in addition to, the professional fee billed for services rendered by physicians to individual patients.

37. For a hospital to bill for outpatient services under the APC reimbursement model, the billing practice must qualify as "provider based" according to strict federal regulations. *See* 42 CFR § 413.65. The practice must operate under the same license as the hospital, the practice's clinical services must be integrated with those of the hospital, the practice's finances must be integrated with the hospital's, and the practice must be held out to the public as a part of the provider. *Id.* If all provider-based regulatory requirements are met, payment for outpatient services may be made under the APC model. It is the hospital, therefore, that is entitled to the APC payment (the "technical" or "facility" fee). Physicians remain entitled to separate payments for their professional services.

38. When services are rendered in an independent physician's office, or by a hospital-owned practice group that does not qualify as provider-based, Medicare will reimburse the billing entity through a single payment based on the physician fee schedule. This single payment will be higher than the professional fee reimbursed to physicians billing in provider-based facilities because it should cover the office's overhead besides the physician's professional services. Many hospitals are eager to acquire practices and set them up as provider-based facilities because, on average, the overall reimbursement from Medicare to provider-based facilities is higher than the reimbursement for the same service to independent physician offices.

39.     When patients are seen at the AGMC provider-based facilities, two bills are submitted to Medicare: one for any APC payment due and one for the professional services of the rendering physician.

40.     AGMC's hospital employs physicians in hospital-owned practices that do not qualify for provider-based billing. When patients receive services at these hospital-owned facilities, a single bill is submitted to Medicare.

41.     Medicare enters into provider agreements with hospitals to establish the hospital's eligibility to participate in the Medicare program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients.

42.     As detailed below, Respondents submitted claims for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

43.     As a prerequisite to payment, CMS requires hospitals to submit annually a Form CMS-2552 (previously form HCFA-2552), more commonly known as the Hospital Cost Report. Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

44.     Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

45.     For all relevant years, the responsible provider official certified:

> [T]o the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

46.     For the entire period at issue, the hospital cost report certification page also included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

47.     The provider must certify that the filed hospital cost report is (1) truthful, i.e., that the cost information in the report is true and accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs under applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Anti-Kickback and Stark Statutes (described below).

## 2.     General Rules for Billing Physician Services

48.     Under Medicare rules, physician services are reimbursed through a payment system called the Resource Based Relative Value Scale ("RBRVS"). In the RBRVS system, payments for medical services and procedures are determined by the resource costs needed to provide them. Payments are calculated by multiplying a standardized measure of the resources the service or procedure is expected to require by region-specific payment rate (conversion factor).

49.     RBRVS payments are based on the Healthcare Common Procedure Coding System ("HCPCS"), HCPCS is a standardized coding system designed to ensure that Medicare, Medicaid and other federal and state-funded health care programs pay for services rendered to patients by physicians and other healthcare professionals under payment schedules tied to the level of professional effort required to render classes or types of medical care. To ensure

uniform descriptions of medical care rendered and consistent compensation for similar work, Government-funded healthcare programs tie levels of reimbursement to these standardized codes.

50.     The Current Procedural Terminology ("CPT") codes are a subset of the HCPCS codes (called Level I codes) and are published and updated annually by the American Medical Association.  Base CPT codes are five-digit numbers organized in numeric sequences that identify both the general area of medicine to which a procedure relates (such as "Evaluation and Management," "Anesthesiology," "Surgery," "Radiology," or general "Medicine") and the medical services and procedures commonly performed by physicians working in that field.

51.     Physicians typically submit claims to Medicare and Medicaid for professional services on Form CMS-1500.  Many physicians employed by hospitals may assign their right to bill for their services to the hospital in return for a compensation package.  In such a case, the hospital will bill for the physician's services.

**B.     The Medicare Advantage Program**

52.     Since the 1970s, Medicare beneficiaries have had the option to receive their Medicare benefits through private health plans, under Part C of the Medicare Program.  The Balanced Budget Act of 1997 named Medicare's managed care program "Medicare + Choice".  The Medicare Prescription Drug, Improvement and Modernization Act of 2003 renamed it "Medicare Advantage".

53.     For people who enroll in a Medicare Advantage plan, CMS pays the private health plan a set amount every month for each member ("capitation").  This amount is set by a bidding process, where private health plans submit bids based on estimated costs per enrollee for services covered under Medicare Parts A and B; all bids that meet the requirements are accepted.  The bids are compared to benchmark amounts set by a formula established in statute, which are

the maximum amounts CMS will pay a plan in an area.  If a plan's bid is higher than the benchmark, enrollees pay the difference in the form of a monthly premium, besides the Medicare Part B premium.  If the bid is lower than the benchmark, the plan receives a "rebate" which must provide supplemental benefits or reduced costs to enrollees.  CMS payments to plans are then adjusted based on enrollees' risk profiles.

54.     The private health plans contract with CMS to perform activities as a Medicare Advantage organization requiring them to comply with federal laws and regulations.  The plans then enter provider agreements with hospitals and physicians, which require them to agree that they will comply with all Federal and State Medicaid requirements, including the fraud and abuse provisions and the Stark and Anti-Kickback Statutes.  A provider who violates these statutes and regulations is not entitled to payment for services rendered to Medicare Advantage patients.

C.    **The Medicaid Program**

55.     Medicaid was also created in 1965 under Title XIX of the Social Security Act. Funding for Medicaid is shared between the Federal Government and those states participating in the program.  Under Title XIX of the Social Security Act ("Medicaid"), 42 U.S.C. § 1396 et seq., federal money is distributed to the states, which in turn provide certain medical services to the poor.   Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program.   The agency must create and implement a "plan for medical assistance" consistent with Title XIX and with the regulations of the Secretary of the United States Department of Health and Human Services ("the Secretary").  After the Secretary approves the plan submitted by the State, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the

plan.  42 U.S.C. § 1396b(a)(1).  This reimbursement is called "federal financial participation" ("FFP").

56.     Federal financial participation in Medicaid spending by each state is calculated each fiscal year under a formula established under Title XIX, with FFP ranging from a low of 50% in federal funding to over 75% in FFP, depending on many factors including such things as the relative wealth of the State and its people and the total amount and kinds of expected Medicaid expenditures needed or expected.  For fiscal year 2014, the FFP for Ohio was 63.02%.

57.     The Ohio Department of Medicaid is the state agency responsible for administration of the Ohio State Medicaid Program.

58.     Ohio's Medicaid program must cover hospital services, 42 U.S.C. § 1396a(1)(A), 42 U.S.C. § 1396d(a)(1)-(2), and uses a cost reporting method similar to that used under Medicare.

59.     Each provider who participates in the Medicaid program must sign a Medicaid provider agreement with his or her state.  Ohio requires the prospective Medicaid provider to agree that he/she will comply with all Federal and State Medicaid requirements, including the fraud and abuse provisions and the Stark and Anti-Kickback Statutes.  A provider who violates these statutes and regulations is not entitled to payment for services rendered to Medicaid patients.

**D.     Other Federal Health Care Programs**

60.     The Federal Government administers other health care programs including, but not limited to, TRICARE, CHAMPVA, and the Federal Employee Health Benefit Program.

61.     TRICARE, administered by the United States Department of Defense, is a healthcare program for individuals and dependents affiliated with the armed forces.

16

62.     CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100-percent service-connected disability.

63.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.

**E.      The Stark Statute**

64.     A section of the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute"), prohibits a hospital (or other entity providing healthcare items or services) from submitting claims to Medicare or Medicaid (see 42 U.S.C. § 1396b(s)) for payment based on patient referrals from physicians who have an improper "financial relationship" (as defined in the statute) with the hospital.

65.     The Stark Statute establishes that providers should not submit claims for items or services referred by physicians with improper financial relationships with the providers of the items or services. In enacting the statute, Congress found that improper financial relationships between physicians and entities to which they refer patients can compromise the physician's judgment whether an item or service is medically necessary, safe, effective, and of good quality. Congress relied on various academic studies consistently showing that physicians who had financial relationships with medical service providers used more of those providers' services than similarly situated physicians who did not have such relationships. The statute was designed specifically to reduce the loss suffered by the Medicare Program due to such increased questionable utilization of services.

66.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory

services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. See Omnibus Budget Reconciliation Act of 1989, Pub. Law 101-239, § 6204.

67.     In 1993, Congress amended the Stark Statute (Stark II) to cover referrals for ten additional designated health services. See Omnibus Budget Reconciliation Act of 1993, Pub. Law 103-66 § 13562, Social Security Act Amendments of 1994, Pub. Law 103-432, § 152.

68.     As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the following eleven "designated health services"; (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; (10) home health services, and (11) clinical laboratory services. See 42 U.S.C. § 1395nn(h)(6).

69.     The Stark Statute provides:

(a)     Prohibition of certain referrals
(1) In general.  Except as provided in subsection (b), if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph 92), then – (A) *the physician may not make a referral to the entity* for the furnishing of designated health services for which payment otherwise may be made [by Medicare or Medicaid]; and (B) *the entity may not present or cause to be presented a claim* under this title or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under (A). 42 U.S.C. § 1395nn(a)(1) (emphasis added).

70.     Therefore, a physician is prohibited from making referrals to an entity with which s/he has a financial relationship for designated health services payable by Medicare or Medicaid. In addition,  providers may not bill Medicare or Medicaid for designated health services furnished because of a prohibited referral.

18

71.     Further, *no payment may be made* by the Medicare or Medicaid programs for designated health services provided in violation of 42 U.S.C. § 1395nn(a)(1).  See 42 U.S.C. §§ 1395nn(g)(1); 1396b(s).

72.     Finally, if a person collects payments billed in violation of 42 U.S.C. § 1395nn(a)(1), that person *must refund those payments* on a "timely basis," defined by regulation not to exceed 60 days.  See 42 U.S.C. § 1395nn(g)(2); 42 C.F.R. § 411.353(d); 42 C.F.R. § 1003.101.

73.     The Stark Statute broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician.  The statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions.

74.     Compensation paid under a bona fide employment relationship may be proper under the Stark Statute, but only if (1) the employment is for identifiable services, (2) the remuneration under the employment (i) is consistent with the fair market value of the services and (ii) is not determined in a manner that considers (directly or indirectly) the volume or value of any referrals by the referring physician, and (3) the remuneration is provided under a commercially reasonable agreement even if no referrals were made to the employer.

75.     Compensation paid under a personal services arrangement between a hospital and a physician may also be proper under the Stark Statute, but only if (1) the arrangement is set out in writing, signed by the parties, and specifies the services covered by the arrangement; (2) the arrangement covers all services to be provided by the physician to the entity; (3) the aggregate services contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes of the entity of the arrangement; (4) the term of the arrangement is for at least 1 year; (5) the compensation to be paid over the term of the arrangement is to be set in advance, does not exceed the fair market value for the services, is not determined in a manner that

19

considers the volume or value of any referrals or other business generated between the parties (unless the agreement falls within the narrowly defined physician incentive plan), and (6) the services do not involve promoting any activity that violates state or Federal law.

76.    To qualify for the Stark Statute's exception for indirect compensation arrangements, defined as any instance where compensation flows from the entity providing designated health services through an intervening entity and then to the referral source, each of these elements to the exception must be established:  (1) there must be a written agreement, (2) the compensation must be consistent with fair market value, (3) the compensation may not consider the volume or value of referrals or other business generated by the referring physician, and (4) the agreement cannot violate the Anti-Kickback Statute.

77.    Violations of Stark may subject the physician and the billing entity to exclusion from participation in federal health care programs and various financial penalties, including (a) a civil money penalty of up to $15,000 for each service in a claim for which the entity knew or should have known that the payment should not be made; and (b) an assessment of three times the amount claimed for a service rendered under a referral the entity knows or should have known was prohibited. See 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

78.    In sum, Stark prohibits hospitals from billing Medicare, Medicare Advantage plans or Medicaid for certain designated health services rendered under a referral by a physician with whom the hospital has a financial relationship of any type not falling within specific statutory exemptions.  42 U.S.C. § 1395nn.  Further, neither Medicare Advantage plans nor Medicaid may pay for any designated health services provided in violation of the Stark Statute. 42 U.S.C. § 1395nn(g)(1), 42 U.S.C. § 1396b(s).  In-patient and out-patient hospital services are among the designated health services to which the Stark referral and billing prohibitions apply.

## F.  The Federal Anti-Kickback Statute

79.  The Medicare and Medicaid Fraud and Abuse Statute (Anti-Kickback Statute), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1977.  The Anti-Kickback Statute arose out of Congressional concern that payoffs to those who can influence health care decisions will cause goods and services to be provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gives rise to overutilization or poor quality of care.

80.  The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(b).  The statute ascribes liability to both sides of an impermissible kickback relationship.

81.  Claims for reimbursement for services or items that result from kickbacks are rendered false under the False Claims Act.  42 U.S.C. § 1320a-7b(g).

82.  The Anti-Kickback Statute contains statutory exceptions that exempt certain transactions from its prohibitions such as contracts for employment or personal services.  The personal services safe harbor applies to payments to an agent if (1) the agency agreement is in writing and signed by the parties, (2) the agreement specifies all services that the agent is to provide for the principal, (3) if "the agency agreement is intended to provide the services of the agent on a periodic, sporadic, or part-time basis" then the agreement must specify the intervals and their schedules and charges with specificity, (4) the term of the agreement must be not less than 1 year, (5) the aggregate compensation to the agent must be set in advance, "consistent with

fair-market value," and not be determined "in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties," (6) the services must not involve promotion of any activity that violates state or Federal law, and (7) the aggregate services contracted for must not exceed those reasonably necessary to accomplish the business purpose of the entity. 42 C.F.R. § 1001.952(d).

83.     The employment safe harbor applies to all remuneration paid by an employer to a bona fide employee "for employment in the furnishing of any item or service for which payment may be made in whole or in part under" any Federal health care program. 42 C.F.R. § 1001.952(i). Opinions by the CMS Office of Inspector General that interpret this safe harbor provision, and case law enforcing it, have found this safe harbor provides a clear-cut defense against liability for violating the Anti-Kickback Statute only where a bona fide employee is compensated exclusively for the provision of professional services covered by a federal health care program. Any payments to a bona fide employee not made for the provision of covered professional services do not fall within the safe harbor.

84.     The act of referring a patient to a hospital or other provider is not a covered item or service. Therefore, any payments made to an employee to compensate that employee for making referrals are not covered by the employee safe harbor. This is true even if the majority of an employee's compensation is for the provision of covered services. The portion of payments made to induce referrals and compensate for an employee's act of referring violates the Anti-Kickback Statute and the safe harbor does not apply.

85.     Once the Government has demonstrated each element of a violation of the Anti-Kickback Statute, the burden shifts to Respondents to establish that Respondents' conduct at issue was protected by a safe harbor or exception. The Government need not prove as part of its affirmative case that Respondents' conduct at issue does not fit within a safe harbor.

86.     Violation of the Anti-Kickback Statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. § 1320a-7(b)(7), 1320a-7a(a)(7).

87.     Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under the Medicare and Medicaid programs.

88.     Either under provider agreements, claim forms, or other appropriate manner, hospitals and physicians who participate in a federal health care program must certify that they have complied with the federal rules and regulations, including the Anti-Kickback Statute.

89.     Any party convicted under the Anti-Kickback Statute must be excluded (i.e., not allowed to bill for services rendered) from federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1). Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must direct the State agencies to exclude that provider from the State health program), and consider imposing administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

90.     The enactment of these various provisions and amendments demonstrates Congress' commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks. Compliance with the Stark and Anti-Kickback Statutes is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare, Medicaid and other federal health care programs.

23

## VI.     ALLEGATIONS REGARDING RESPONDENTS' WRONGDOING

### A.     Summary of Respondents' Unlawful Conduct

91.     In or about 2010, Respondents AGHS, AGMC, PPG, AGP and NHV (collectively referred to as "AGHS" unless otherwise indicated) initiated an aggressive strategy to increase its control over health care delivery around its hospital location.  As part of this strategy, AGHS instituted a corporate policy to purchase physician practices and/or employ physicians in the area to control patient referrals for both inpatient and outpatient services, including those covered by federally-funded healthcare programs and the designated health services listed in the Stark Statute.  Subsequently, these physicians increased the number of patients, including Medicare, Medicare Advantage, Medicaid, and other federally-insured patients they referred to AGHS for outpatient and inpatient hospital services.

92.     AGHS accordingly employed greater numbers of physicians and purchased physician practices in the specialties of urology, plastic surgery, acute care surgery, internal medicine and others and brought the physicians and their staffs on as hospital employees. As employees, the physicians must refer patients to AGHS for inpatient and ancillary services, except in limited circumstances.   To make employment at AGHS more attractive to the employed physicians than maintaining their own private practices – i.e., to keep them from terminating their contracts and returning to independent practice or working for competitor hospitals – AGHS has provided and continues to provide what it knows to be excessive compensation, perks, and benefits to its physician employees.

93.     AGHS's scheme to control referral revenue by overcompensating employed physicians and physicians contracted under personal service arrangements is made clear both from (a) the details of individual deals struck  to get physicians to sell their practices and sign on as AGHS employees and (b) the pattern of economic trade-offs AGHS has created and

maintained between persistent losses AGHS endures in operating the purchased physician practices and the substantial gains from hospital admissions and ancillary service referrals that AGHS realizes by capturing nearly 100% of the referral business their employee physicians can generate.

94.    Consistently, year after year, AGHS loses large sums of money on the physician practices it owns. Such losses exist because the level of income those practices generate cannot sustain both (a) the substantially above-market salaries, bonuses, and other perks and benefits AGMC provides the employee physicians whose practices AGHS purchased and (b) the other, normal operating expenses required to run those practices.

95.    As stand-alone ventures, AGHS's physician practices are not economically viable.  In most significant part, this is so because the total package of compensation and benefits AGHS pays the physicians who previously owned the practices, or who have been hired to operate such hospital-owned practices, is not rationally related to the income produced by those physicians while performing the professional services for which they purportedly are being paid. Such imbalance between physician practice income and expenditures exists although, on average across all areas in which physician reimbursement is paid, federal healthcare programs pay more reimbursement for services provided to patients by provider-based physician practices than would be paid for the same services had they been provided in physician-owned practices.

96.    AGHS is compensating the doctors whose practices they have purchased at levels that not only exceed what AGHS can rationally pay while maintaining a physician practice that could be economically viable on its own merits, but that even more dramatically exceed what AGHS's employee physicians could reasonably expect to earn had those physicians continued to own and operate the business themselves.

97.     AGHS has similarly hired and over-compensated new physicians entering their geographic markets to secure for themselves, directly and indirectly, patient referrals that such physicians have or gain the power to control or influence.

98.     Both AGHS and the physicians AGHS has employed have understood and intended that a substantial portion of the compensation such physicians are paid and the resulting losses AGHS is bearing on those physician practices are tolerated by AGHS only because AGHS tracks the value of the referrals obtained from those same physicians and knows that it can more than make up for those losses through the marginal gains in income that AGHS realizes by using such arrangements to maximize the referrals the hospitals received from those physicians for inpatient and ancillary services. .

99.     AGHS also has realized and intended that the referrals AGHS has gained because of such arrangements with physicians would include referrals of Medicare, Medicare Advantage, Medicaid and other federally-insured patients.

100.     Relator has significant personal experience with AGHS and has seen many ways in which AGMC has funneled excessive compensation to its physicians.  These include inflated base salaries, bonuses and other payments, all designed to induce referrals to AGHS.

101.     AGHS's payments to its employed physicians constitute improper financial relationships under the Stark Statute not subject to any safe harbor.  Such payments similarly violate the federal Anti-Kickback Statute.

102.     Because of these payments, the physicians at AGHS have increased the number of patients, including Medicare, Medicare Advantage, Medicaid, and other federally-insured patients, they referred to AGHS for outpatient and inpatient hospital services.

103.     AGHS knowingly submitted (and continues to submit) to Medicare, Medicare Advantage plans, Medicaid, and other federal health care programs claims for reimbursement

26

and claims for interim payment on annual hospital cost reports covering at least the past 5 years for the medical services and items provided because of these kickbacks or referrals although AGHS knew that the claims were not properly payable and should not have been submitted under the applicable laws and regulations.

104.    Each annual hospital cost report AGHS and AGMC filed over the past 5 years falsely certified the medical services and items identified were provided in compliance with all applicable laws and regulations.

105.    In addition, AGHS has also permitted rampant overbilling by its employee physicians and submitted claims for reimbursement to Medicare, Medicare Advantage plans, Medicaid and other federally-insured programs in reckless disregard or with deliberate ignorance of the fact that many are improperly billed and falsely certified.

106.    The executives at AGHS know that many of their employee physicians have had and continue to have consistent upcoding and overbilling issues which led to overcompensation by Medicare, Medicare Advantage plans, Medicaid and other federally-insured programs, but they have refused to correct these issues both out of concern that doing so would strain hospital relations with their referring doctors and because the hospitals themselves directly and indirectly benefit from the overcharges.

107.    Such overbilling includes systematic upcoding and improper billing of physician services for which the physician was not physically present.

**B.      Payments to Physicians and Other Non-Physician Practitioners to Induce Referrals in Violation of the Stark and Anti-Kickback Statutes**

**1.      Overview**

108.    AGHS has paid and continues to pay excessive compensation to its employee physicians, and physicians working under personal service arrangements, in AGHS's medical,

surgical, and primary care practices to retain their services and to ensure their substantial referral stream.

109. As set forth in greater detail below, these payments result in consistent and substantial losses to AGHS on its hospital-owned physician practices. These payments do not reflect the fair market value of the outpatient services for which the payments purportedly compensate the physicians. Nor are the payments AGHS makes to such physicians independent of the value of the physicians' referrals. Rather, a portion of the physicians' compensation is tied directly to the volume of business they refer to AGHS which employs them as regular or contract employees. Therefore, these payments create improper financial relationships between AGHS and its referring physicians. Further, these payments do not fall within any safe harbor. Under the Stark and Anti-Kickback Statutes, all services billed because of referrals from these physicians are improper and non-reimbursable.

110. Each physician employed by AGHS is treated as his/her own "cost center." All revenues from a physician's billings are credited to his/her "cost center."

111. This revenue stream is credited to the physician's salary, the salaries for support staff, the costs of the facility, and the hospital overhead attributable to the physician cost center. If the revenue derived from the physician's professional services and associated facility fees cannot cover these costs, the hospital will show a loss for that physician cost center.

112. AGHS tracks these losses by individual physician and by their respective groups.

113. AGHS's internal analysis shows that AGHS generally loses substantial money employing physicians to staff provider-based outpatient departments.

114. AGHS has sustained such losses on its hospital owned physician practices for at least the last five years. AGHS corporate employees serving as administrators, including

AGHS's current CEO have on several occasions indicated these losses are due to the overcompensation of the physicians employed by the hospital.

115. AGHS is not concerned about these losses from the perspective of their business plan. This is because, in conjunction with tracking losses AGHS sustains through employment of physicians to staff outpatient departments, AGHS also tracks the "contribution margin" realized by AGHS because of inpatient and ancillary service referrals that can be traced to each employee physician cost center and their respective groups. "Contribution margin" is the revenue from each physician cost center's referrals to his/her employing hospital for inpatient services or outpatient ancillary services (i.e., the revenue received by AGHS when the relevant physician is the attending and/or referring physician). Controlling and capturing such referrals allows AGHS to ensure that its employed physicians are generating enough inpatient and ancillary service income to the hospital to more than make up for the losses on the excessive outpatient compensation.

116. AGHS's internal analysis shows that almost uniformly, contribution margins through patient referrals are large enough both to offset the losses suffered because of the overcompensation of physicians employed to staff outpatient departments.

117. While such analysis allays immediate concerns at AGHS on the economic viability of paying employee doctors such generous salaries, AGHS remains concerned about the legal risks associated with the potential discovery by federal or state officials of the economic model that drives AGHS's business decisions in this respect. This is because AGHS understands that its own internal analyses of the economic trade-off it is making between outpatient physician practice losses and revenues AGHS realizes from associated patient referrals for inpatient and ancillary hospital services reveals that AGHS's main financial interest in owning and operating such physician practices is the income they gain from associated patient referrals.

29

118.    AGHS and the corporate officers/employees (including the CEO and other high-level officers of AGHS and AGMC are involved in this economic structure and well aware of its illegality.    AGHS's corporate group closely monitors and oversees management of the relationship between AGHS's losses on employed physicians and associated "contribution margins" AGHS gains in exchange.

119.    These kinds of economic considerations – based on AGHS's desire to maintain "contribution margins" driven by employee physician referrals – represent the overriding logic behind AGHS's business decisions.    Such considerations drive AGHS's decisions regarding what physicians to employ, how much and in what actual and/or pretextual way to pay them, and – unfortunately, for both patients and payors like Federal and State Governments – how vigorously to insist such physicians abide by rules regarding medical necessity and proper billing of rendered patient care.    Since AGHS began acquiring physician practices over five years ago, AGHS's main interest in making physicians employees or contract laborers has been to ensure consistent and robust referral flows.

120.    AGHS has routinely acquired physician practices, not to provide better or more efficient care but instead openly or principally to acquire the stream of referrals that would come with the acquisition.    Achieving that goal with physicians who well-understand the gains they can realize in pay, perks, and benefits by leveraging the value of the referrals they can make has made AGHS all too willing to accept consistent losses on their employed physicians' outpatient practices at the same time that AGHS turns a blind eye to performance and legal and ethical lapses in those employees' billing practices.

121.    AGHS has made no genuine attempt to lower physician compensation to fair market value for properly compensable services those physicians supply.    Further, even if AGHS has put in place tools to curb losses, they do not utilize them if doing so would reduce

referrals. For instance, while many physicians at AGHS have provisions in their contracts that purport to require that the physicians' salaries be reduced and/or permit the hospital to reduce their salaries should their practice losses exceed a certain level, such contract provisions are never enforced in a manner that would threaten continued patient referrals from either the affected doctor or from other doctors who might be alarmed to see such enforcement of contract terms occur.

### 2. The Urology Practice

122.   On June 11, 2010, AGMC purchased substantially all of the assets of the Center for Urologic Health, LLC ("CUH") and AGMC, NHV, AGP and/or PPG entered a 5-year lease (the "Urology Lease"), renewable for 2 years, of CUH's urologist physician employees.

123.   Under the Urology Lease, AGMC/NHV/AGP/PPG has paid CUH for physician services each year from August 1, 2010 to present: (1) $7,200,000 in base compensation for 12 physicians; (2) $553,846 as a signing or retention bonus; and (3) an incentive bonus of 9% of the net collections for all professional fees billed by AGMC on behalf of CUH's physicians.

124.   The incentive bonus paid to CUH by AGMC/NHV/AGP/PPG was $1,470,120 in 2011, $415,384.86 in 2012 and $1,562,502 for 2013. On information and belief based on AGMC's financial records, AGMC/NHV/AGP/PPG paid similar amounts to CUH as an incentive bonus in 2014 and 2015.

125.   The median compensation for urologists employed by hospitals in the United States was $192,000 in 2012, $328,000 in 2013, and $328,000 in 2014.

126.   The average compensation for the 12 CUH physicians paid by AGMC/NHV/AGP/PPG as provided for in section 9.2 of the Urology Lease was $768,663.83 in 2011, $680,769.20 in 2012, and $776,362.33 in 2013. On information and belief, based on AGHS's corporate and financial records, the average compensation for the 12 CUH physicians

paid by AGMC/NHV/AGP/PPG as provided for in section 9.2 of the Urology Lease, was in similar amounts in 2014 and 2015.

127.    In addition, AGMC/NHV/AGP/PPG reimbursed CUH for all its costs and expenses in providing the leased services and had paid CUH $600,000 a year for management services under a June 11, 2010 co-management agreement.  AGMC/NHV/AGP/PPG has also individually paid CUH physicians $92,560 to serve as Medical Director, Residency, $140,000 to serve as Medical Director, $100,170 to serve as Chairman, Urology, and $167,232 to serve as Program Director, Urology under employment agreements.

128.    The services specified by the CUH co-management, medical director, program director and chairman agreements have not been provided by CUH and/or its physicians.  In January through March, 2015, the time sheets required to support the provision of the agreed services, showed that the required hours of services were not being provided.  The description of services on the time sheets were inadequate to demonstrate that they were the type of services required by the agreements.  The medical director agreement required no specific amount of services and the services provided were compensated at a rate far above fair market value.  AGMC/PPG has made the annual payments required by the above described agreements to CUH or its physicians, knowing the failure by CUH to provide the agreed services from 2010 to present.  The medical director agreement with one of the CUH physicians, Dr. Raymond Bologna, to serve as Chairman of the Department of Urology for $100,170 expired on December 31, 2011.  Despite this expiration, AGMC continued paying Dr. Bologna on the expired contract until a new agreement was entered on November 18, 2013.

### 3.    The Plastic Surgery Practice

129.    On January 24, 2011, AGMC purchased substantially all the assets used by Akron Plastic Surgeons, Inc. in the conduct of a plastic surgery practice and entered a Professional and

Administrative Services Lease Agreement (the "Plastic Surgery Lease") with Akron Plastic Surgeons, LLC ("APS"), whereby AGMC leased APS' physician and non-physician employees to provide plastic surgery and related administrative services. The Plastic Surgery Lease also provided for an annual payment of $145,000 to APS for the management of the plastic surgery practice conducted by the leased employees.

130.    The incentive bonus paid to APS by AGMC was $442,667 in 2012 and $467,261 in 2013. On information and belief, based on AGMC's corporate and financial records, AGMC paid similar amounts to APS as an incentive bonus in 2014 and 2015.

131. The physicians contracted to provide acute care surgery services described above, will be collectively referred to as the "APS Physicians".

132.    The median compensation for plastic surgeons employed by hospitals in the United States was $155,000 in 2012, $261,000 in 2013, $297,000 in 2014 and $279,000 in 2015.

133.    The average compensation for the 3 APS physicians paid by AGMC as provided for in section 8.2 of the Plastic Surgery Lease was $727,556 in 2012, and $735,754 in 2013. On information and belief, based on AGMC's corporate and financial records, the average compensation for the 3 APS physicians paid by AGMC as provided for in section 8.2 of the Plastic Surgery Lease was in similar amounts in 2014 and 2015.

134.    In addition, AGMC reimbursed APS for all its costs and expenses in providing the leased services and has paid APS $145,000 a year for services in managing the APS practice under the Plastic Surgery Lease. AGMC has also paid APS, $250,000 a year for services in managing and marketing AGMC hand, breast reconstruction and cosmetic programs' under a co-management agreement dated January 24, 2011, the same date as the APS Lease agreement.

135.    The services specified by the APS co-management agreement have not been provided by APS. The time sheets required by the APS co-management agreement were not

33

provided by APS from January 2011 through November 2013.  When requested to provide the time sheets in November 2013, APS acknowledged that they had not completed time sheets but provided backdated time sheets for the period January through October, 2013.  These time sheets did not support that the required hours of service were being provided.  The description of services on the time sheets were inadequate to demonstrate that they were the services required by the agreements.

136.    The APS co-management agreement provides that APS will provide services in developing and managing AGMC's breast reconstruction program and serve as primary contact in marketing.  However, as of November, 2013, APS had had no interaction or role with AGMC's Breast Center.  Moreover, APS had not participated in marketing efforts specific to AGMC's service lines.

137.    The average compensation for APS physicians paid by AGMC, when the $250,000 annual co-management fee is included, was $810,889 in 2012 and $819,087 in 2013.  On information and belief, based on AGMC's corporate and financial records, the annual compensation for APS physicians, including the co-management fee, paid by AGMC was in similar amounts in 2014 and 2015.

### 4.    The Acute Care Surgery Practice

138.    On January 1, 2011, AGMC entered professional services agreements for a 1 year term, with Scott A. Awender, M.D., Walter J. Chylsta, M.D., Andrew H. Fenton, M.D., Robert H. Marley, M.D., William C. Papouras, M.D. and Charudutt Paranjape, M.D. to provide call coverage for acute care surgery services at AGMC at $3,600 per 24 hour shift.

139.    AGMC also entered professional service agreements, for a term extending from February 1, 2013 or February 25, 2013 through December 31, 2015, with Awender, Chlysta,

Fenton, Marley, and Mark C. Horattas, M.D. to provide call coverage for acute care surgery services at AGMC at $3,600 per 24 hour shift.

140.    On information and belief based on AGMC's corporate and financial documents, AGMC agreed to pay Kevin Lowe M.D., Papouras and Paranjape, $3,600.00 per 24 hour shift, to provide call coverage for acute care surgery services at AGMC from 2012 to present. (The physicians contracted to provide acute care call coverage services described above, will be collectively referred to as the "ACS Physicians")

141.    Under the above described call coverage agreements, AGMC paid each of the ACS Physicians, $3,600 per 24 hour shift of on-call coverage for acute care surgery services from 2011 to present. For example in 2013, AGMC paid Awander $162,000 for 45 days, Chlyster $165,600 for 46 days, Fenton $165,600 for 46 days, Horattas $162,000 for 45 days, Lowe $162,600 for 45 days, Marley $165,600 for 46 days, Papouras $165,600 for 46 days, and Paranjape $165,600 for 46 days.

142.    The $3,600 stipend per 24 hour shift is far over the fair market value for such services, which is less than $1,200 per 24 hour shift.

143.    The median compensation for a 24 hour period of on-call coverage by a general surgeon was $920 in 2011, and $1,000 in 2012.

144.    In comparable agreements dated July 21, 2011 for call coverage for trauma surgery, AGMC agreed to pay Lowe, Paranjape, and Papouras $1,160 per 24 hour shift.

145.    The payments over fair market value, were purportedly to compensate the ACS physicians for revenue lost from services for their private patients, which they would not be performing while being on-call to provide acute care surgery services to AGMC.

146.    However, AGHS' records demonstrate that all of the ACS physicians regularly provided services, including office visits and surgeries, for their private patients, while the ACS Physicians were in an on-call status for AGMC acute care surgery services.

147.    The ACS physicians were also regularly on an on-call status to provide services for the clinic, trauma and ICU departments at the same time they were on-call to provide ACS services.

### 5.    The Internal Medicine Practice

148.    On November 3, 2011, AGHS purchased substantially all the assets used by Internal Medicine of Akron, Inc. ("IMA") in the conduct of an internal medicine practice and entered a Professional and Administrative Services Lease Agreement with IMA (the "IMA Lease") to provide physician and related administrative services.

149.    Under the IMA Lease, AGHS or AGMC has paid IMA for physician services each year from November 3, 2011 to present:  (1) $950,000 in base compensation for 3 physicians; (2) an incentive bonus of 7.5% of the net collections for professional fees billed by AGHS/AGMC on behalf of IMA's physicians; and (3) $80,000 for management of the internal medicine practice.

150.    The incentive bonus paid to IMA by AGHS/AGMC was $129,996 in 2012 and $157,639 in 2013.  On information and belief, based on relator's experience and on AGMC's corporate and financial records, AGHS/AGMC paid similar amounts to IMA as an incentive bonus in 2014 and 2015.

151.    The median compensation for internists employed by hospitals in the United States was $163,000 in 2012, $192,000 in 2013, $190,000 in 2014 and $199,000 in 2015.

152.    The average compensation for the 3 IMA physicians paid by AGHS/AGMC, as provided for in section 8.2 of the IMA lease, was $359,999 in 2012, and $369,213 in 2013.

153.   In addition AGHS/AGMC reimbursed IMA for all its costs and expenses in providing the leased services, $80,000 a year for management services, and paid $160,000 a year to one IMA physician to serve as a medical director.  With respect to the management services, no specified hours of work were required.  With respect to the medical director agreement, the time sheets did not support that the required hours of service were being provided.

### 6.    False Certifications of Compliance with the Stark and Anti-Kickback Statutes

154.   AGMC has falsely certified to Medicare, the Medicare Advantage plans, Medicaid and other federally funded health care programs it complied with the Stark and Anti-Kickback Statutes from 2010 to present.

155.   From 2010 to present, AGMC has annually submitted to Medicare, Hospital Cost Reports (Form CMS-2552) containing the certification of compliance described in Section V.(A.)(1) above.

156.   From 2010 to present, AGMC has falsely certified to Medicare Advantage plans, including but not limited to Aetna Medicare, Anthem Medicare, Aultcare Medicare, Hometown Medicare, Humana Medicare, MMO Medicare, Summacare Medicare, United Medicare and Wellcare Medicare ("the Medicare Advantage Plans") that it complied with the Stark and Anti-Kickback Statutes from 2010 to present.

157.   On information and belief, based on Medicare regulations and manuals, AGMC has certified to the Medicare Advantage Plans, in provider agreements it entered with the plans, that it agreed to comply with the Stark and Anti-Kickback Statutes at all times relevant to this complaint.  At the time, AGMC entered into the Medicare Advantage Plans, AGMC knew it did not comply with the Stark and Anti-Kickback Statutes.

158.   AGMC falsely certified to Medicare, the Medicare Advantage Plans and Medicaid on claims it submitted on behalf of its physician employees on CMS-1500 forms from

37

2012 to present, that "this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal Anti-Kickback Statutes and Physician Self-Referral law (commonly known as Stark law)".

159.    From 2010 to present, AGMC submitted claims for reimbursement to Medicare, the Medicare Advantage Plans, Medicaid and other federal healthcare programs related to the AGMC physicians as described below (the "AGMC Claims"). Compliance with the Stark and Anti-Kickback Statutes is a precondition to payment for the AGMC claims. AGMC's actions in submitting the AGMC claims when it violated its continuing duty to comply with the Stark and Anti-Kickback Statutes constitutes an implied false certification.

### 7.    False Claims

160.    From 2010 to present, AGMC has submitted numerous claims on Forms CMS-1500, UB-92 and UB-04 to Medicare, the Medicare Advantage Plans, Medicaid and other federally funded health care programs for reimbursement for designated health services, including but not limited to inpatient and outpatient services, rendered under the above-described agreements and under referrals by physicians with whom AGMC has an improper financial relationship, in violation of the Stark and Anti-Kickback Statutes as described above.

161.    These claims were false and fraudulent because they include items or services resulting from a violation of the Anti-Kickback and Stark Statutes as described above.

162.    These claims were also false or fraudulent because they were submitted based on express or implied false certifications that AGMC complied with the Stark and Anti-Kickback Statutes as described above.

163.    Representative examples of the false claims submitted in connection with the Urology Practice include:

      a.       a claim submitted to Medicaid on or about 2/19/2015 for services rendered by Dr. D. Bentley for patient account no. xxxxxx458NFMA.

      b.       a claim submitted to Medicare on or about 3/19/2015 for services rendered by Dr. D. Bentley for patient account no. xxxxxx178NFMC.

      c.       a claim submitted to Medicaid on or about 3/31/2015 for services rendered by Dr. R. Bologna for patient account no. xxxxxx511NFMA.

      d.       a claim submitted to Medicare on or about 3/31/2015 for services rendered by Dr. D. Bentley for patient account no. xxxxxx526NFMC.

      e.       a claim submitted to Medicaid on or about 2/14/2015 for services rendered by Dr. T. Breaux for patient account no. xxxxxx561NFMA.

      f.       a claim submitted to Medicare on or about 4/8/2015 for services rendered by Dr. R. Bologna for patient account no. xxxxxx665YFMC.

      g.       a claim submitted to Medicaid on or about 6/3/2015 for services rendered by Dr. B. Canterbury for patient account no. xxxxxx490NFMA.

      h.       a claim submitted to Medicare on or about 2/18/2015 for services rendered by Dr. T. Breaux for patient account no. xxxxxx511NFMC.

      i.       a claim submitted to Medicaid on or about 2/20/2015 for services rendered by Dr. G. Danesis for patient account no. xxxxxx664NFMA.

      j.       a claim submitted to Medicare on or about 1/23/2015 for services rendered by Dr. J. Danoff for patient account no. xxxxxx201NFMC.

      k.       a claim submitted to one of the Medicare Advantage Plans on or about 2/28/2015 for services rendered by Dr. D. Green for patient account no. xxxxxx517NFMR.

      l.       a claim submitted to one of the Medicare Advantage Plans on or about 2/11/2015 for services rendered by Dr. D. Bentley for patient account no. xxxxxx356NFMR.

m.      a claim submitted to one of the Medicare Advantage Plans on or about 1/28/2015 for services rendered by Dr. L. Geller for patient account no. xxxxxx857NFMR.

n.      a claim submitted to one of the Medicare Advantage Plans on or about 3/26/2015 for services rendered by Dr. L. Geller for patient account no. xxxxxx268NFMR.

o.      a claim submitted to one of the Medicare Advantage Plans on or about 3/14/2015 for services rendered by Dr. D. Green for patient account no. xxxxxx411NFMR.

164.    Representative examples of the false claims submitted in connection with the Plastic Surgery Practice include:

a.      a claim submitted to Medicaid on or about 4/8/2015 for services rendered by Dr. J. Pedersen for patient account no. xxxxxx855NFMA.

b.      a claim submitted to Medicare on or about 3/21/2015 for services rendered by Dr. J. Pedersen for patient account no. xxxxxx344NFMC.

c.      a claim submitted to Medicaid on or about 4/4/2015 for services rendered by Dr. J. Pedersen for patient account no. xxxxxx150NFMA.

d.      a claim submitted to Medicare on or about 1/23/2015 for services rendered by Dr. M. Parker for patient account no. xxxxxx328NFMC.

e.      a claim submitted to Medicaid on or about 4/4/2015 for services rendered by Dr. J. Pedersen for patient account no. xxxxxx151NFMA.

f.      a claim submitted to Medicare on or about 1/14/2015 for services rendered by Dr. M. Parker for patient account no. xxxxxx327NFMC.

g.      a claim submitted to Medicaid on or about 2/28/2015 for services rendered by Dr. D. Wagner for patient account no. xxxxxx236NFMA.

h.      a claim submitted to Medicare on or about 3/12/2015 for services rendered by Dr. J. Pedersen for patient account no. xxxxxx893NFMC.

40

i.      a claim submitted to Medicaid on or about 4/25/2015 for services rendered by Dr. D. Wagner for patient account no. xxxxxx599NFMA.

j.      a claim submitted to Medicare on or about 3/5/2015 for services rendered by Dr. D. Wagner for patient account no. xxxxxx042NFMC

k.      a claim submitted to one of the Medicare Advantage Plans on or about 4/1/2015 for services rendered by Dr. D. Wagner for patient account no. xxxxxx340NFMR.

l.      a claim submitted to one of the Medicare Advantage Plans on or about 4/8/2015 for services rendered by Dr. J. Pedersen for patient account no. xxxxxx684NFMR.

m.      a claim submitted to one of the Medicare Advantage Plans on or about 2/27/2015 for services rendered by Dr. D. Wagner for patient account no. xxxxxx859NFMR.

n.      a claim submitted to one of the Medicare Advantage Plans on or about 3/5/2015 for services rendered by Dr. D. Wagner for patient account no. xxxxxx091NFMR.

o.      a claim submitted to one of the Medicare Advantage Plans on or about 4/3/2015 for services rendered by Dr. J. Pedersen for patient account no. xxxxxx982NFMR.

165.      Representative examples of the false claims submitted in connection with the Internal Medicine Practice include:

a.      a claim submitted to Medicare on or about 2/10/2015 for services rendered by Dr. E. Maseelall for patient account no. xxxxxx856YFMC.

b.      a claim submitted to Medicaid on or about 3/10/2015 for services rendered by Dr. E. Maseelall for patient account no. xxxxxx469NFMA

c.      a claim submitted to Medicare on or about 2/18/2015 for services rendered by Dr. M. Gedeon for patient account no. xxxxxx454YFMC.

d.      a claim submitted to Medicaid on or about 1/24/2015 for services rendered by Dr. E. Maseelall for patient account no. xxxxxx449NFMA

41

      e.     a claim submitted to Medicare on or about 2/4/2015 for services rendered by Dr. M. Fistek for patient account no. xxxxxx932YFMC.

      f.     a claim submitted to Medicaid on or about 3/18/2015 for services rendered by Dr. J. Edsman for patient account no. xxxxxx502NFMA.

      g.     a claim submitted to Medicare on or about 2/18/2015 for services rendered by Dr. E. Maseelall for patient account no. xxxxxx299YFMC.

      h.     a claim submitted to Medicaid on or about 1/20/2015 for services rendered by Dr. M. Fistek for patient account no. xxxxxx537NFMA.

      i.     a claim submitted to Medicare on or about 2/26/2015 for services rendered by Dr. M. Gedeon for patient account no. xxxxxx236NFMC.

      j.     a claim submitted to Medicaid on or about 1/20/2015 for services rendered by Dr. E. Maseelall for patient account no. xxxxxx532NFMA.

      k.     a claim submitted to Medicare on or about 2/10/2015 for services rendered by Dr. E. Maseelall for patient account no. xxxxxx856YFMC.

      l.     a claim submitted to one of the Medicare Advantage Plans on or about 1/13/2015 for services rendered by Dr. J. Eckman for patient account no. xxxxxx891NFMR.

      m.     a claim submitted to one of the Medicare Advantage Plans on or about 1/9/2015 for services rendered by Dr. E. Maseelall for patient account no. xxxxxx703NFMR.

      n.     a claim submitted to one of the Medicare Advantage Plans on or about 1/23/2015 for services rendered by Dr. E. Maseelall for patient account no. xxxxxx496NFMR.

      o.     a claim submitted to one of the Medicare Advantage Plans on or about 3/19/2015 for services rendered by Dr. E. Maseelall for patient account no. xxxxxx535NFMR.

      p.     a claim submitted to one of the Medicare Advantage Plans on or about 1/22/2015 for services rendered by Dr. M. Gedeon for patient account no. xxxxxx861NFMR.

166.     Representative examples of the false claims submitted in connection with the Acute Care Surgery include:

      a.    a claim submitted to Medicaid on or about 3/27/2013 for services rendered by Dr. H. Awander related to patient control no. xxxxxx45001.

      b.    a claim submitted to Medicare on or about 3/27/2013 for services rendered by Dr. H. Awander related to patient account no. xxxxxx61001.

      c.    a claim submitted to Medicaid on or about 8/19/2013 for services rendered by Dr. Paranjape related to patient control no. xxxxxx06001.

      d.    a claim submitted to Medicare on or about 7/22/2013 for services rendered by Dr. A. Fenton related to patient control no. xxxxxx70001.

      e.    a claim submitted to Medicare on or about 4/1/2013 for services rendered by Dr. A. Fenton related to patient control no. xxxxxx17001.

      f.    a claim submitted to Medicare on or about 5/1/2013 for services rendered by Dr. K. Lowe related to patient control no. xxxxxx73001.

      g.    a claim submitted to Medicare on or about 10/3/2013 for services rendered by Dr. H. Awander related to patient control no. xxxxxx68001.

      h.    a claim submitted to Medicare on or about 2/13/2014 for services rendered by Dr. K. Lowe related to patient control no. xxxxxx32001.

      i.    a claim submitted to one of the Medicare Advantage Plans on or about 10/30/2013 for services rendered by Dr. Paranjape related to patient control no. xxxxxx07001.

      j.    a claim submitted to one of the Medicare Advantage Plans on or about 8/5/2013 for services rendered by Dr. Paranjape related to patient control no. xxxxxx01001.

167.     On information and belief, based upon AGMC's financial records, the above-described claims were paid by Medicare, the Medicare Advantage Plans or Medicaid.

## 8. Respondents' Knowledge that They are Overpaying Physicians

168. Relator Brouse worked in the AGHS compliance and audit departments from 2002 to December, 2015. She initially worked in the compliance department from 2002 to 2012. In 2012, she was appointed interim Compliance Officer, a position which she held for one year. In 2013, she was appointed Director of Internal Audit, a position which she held until December, 2015, when AGHS terminated her employment.

169. As Director of Internal Audit, Brouse reported directly to the Compliance and Internal Audit Committee ("the CIA Committee") of AGHS's Board. One of the members of the CIA Committee was AGHS's CEO, Dr. Thomas Stover.

170. Upon taking the position of Director of Internal Audit in 2013, Brouse developed a five-year plan, which was approved by the AGHS Board of Directors. One of its primary goals was review of the physicians' practices purchased or developed by AGHS since 2010. She focused on the physicians' practices because they were consistently showing major losses.

171. Under this five-year plan, she conducted or planned to completely review the physicians' practices. This review included a thorough analysis of the practices' records and operations. The first reviews she commenced in 2013, were of the Plastic Surgery Practice and the Acute Care Surgery Practice. She planned to review the Urology Practice and other practices at a subsequent point.

172. The physicians for the practices that were the subject of the review are employed by PPG/NHV/AGP. The financial statements for the practices reviewed by Relator Brouse, at meetings and in her audit work, showed they were consistently running at a major loss. The principle factor in these losses was the compensation paid to the physicians.

173. In 2013, Relator Brouse discussed the significant practice losses at a CIA Committee meeting. Dr. Stover, AGHS's CEO, stated that she was not considering the

contribution margin.  He explained at that meeting and in other discussions that the physician salaries were an investment in which losses were expected, but would be made up for by hospital revenues other than physician service revenues, generated by the physicians' referrals.  He stated on a number of occasions that this was AGHS' business model.

174.    Relator Brouse reviewed the Plastic Surgery Practice in 2013 and 2014.  During her review, she discovered compensation for APS physicians' services far over fair market value, and the failure of APS physicians to provide administrative services for which they were receiving additional compensation, as described above.

175.    Relator Brouse discussed the Plastic Surgery Practice issue and False Claims Act violations with AGMC's President, Alan Papa.  He stated that AGMC had to throw money at the APS physicians to obtain agreement to their participation in the above-described agreements with APS.

176.    Relator Brouse also reviewed the Acute Care Surgery Practice in 2013 and 2014. During her review, she discovered compensation for ACS physicians for on-call coverage services far over fair market value, as described above.

177.    Relator Brouse brought these findings and False Claims Act violations to the attention of AGHS's CEO, Dr. Stover, AGMC's President, Alan Papa and the CIA Committee.

178.    In one discussion with Relator Brouse regarding the findings and False Claims Act violations, ACHS' CEO stated that he will always take the side of the physicians.  He also reiterated previous statements that it was AGHS' business model to make up for losses on physician compensation with the contribution margin, comprising of hospital revenues obtained from the physicians' referrals.

179.    After bringing the above-described findings and False Claims Act violations to the attention of the CIA Committee, Relator Brouse was excluded from the last six meetings of the committee in 2015.

180.    Besides Relator Brouse's findings, internal coding on billings audits in 2012 and 2013 have shown that the Urology Practice consistently engages in upcoding of services it was billing, as further described below.

181.    Subsequently, Relator Brouse was informed by AGHS' Compliance Officer Lynn Fichter that AGHS' CEO had told her to let go of the Urology upcoding issue.

182.    Relator Brouse, as part of the five-year plan she had presented to the CIA Committee, had planned to review the Urology Practice. However, AGHS' Compliance Officer told her that AGHS management did not want her to look at the Urology Practice.

183.    On or about December 17, 2015, Relator Brouse's employment was terminated by AGHS.

### 10.    Improper Bonus Arrangements

184.    AGHS is losing money on its employed physicians in part based on hefty base compensation and perks as described above. But much additional compensation is also provided through various bonus structures which in and of themselves often constitute improper compensation arrangements under the Stark Law and payments to induce referrals under the Anti-Kickback Statute.

185.    Not only do these bonuses often result in or add to the general overcompensation of AGHS' physicians, they create improper financial relationships with the referring physicians not subject to any Stark safe harbor. The Stark safe harbor for payments to employees applies only when the remuneration is consistent with fair market value and is not determined in a manner that considers the volume or value of referrals by the compensated physician. The

incentive bonus payments made under the Urology Lease, the Plastic Surgery Lease and the IMA Lease all were based on a percentage of collections. Because of these leases, the affected physicians increased their incentive bonus payments by making additional referrals for designated health services to AGHS. These bonuses create an improper compensation arrangement between each physician not subject to any Stark safe harbor.

### C. AGMC's Fraudulent Upcoding and Improper Billing Practices

**[Urology Upcoding]**
**[Failure to meet Requirements regarding Presence of Physician]**
**[Discrimination against Medicaid Patients]**

186. AGMC has significant billing issues which its administration has refused to correct. These issues include: consistent upcoding and improperly billing the services of non-physician practitioners under the provider number of physicians.

187. In 2012 and 2013, AGMC's compliance department conducted coding and billing audits of the Urology Practice's billings and determined that the Urology physicians were consistently selecting billing codes for services that resulted in remuneration higher than the services rendered qualified for, a practice known as upcoding.

188. Despite efforts to resolve the consistent upcoding conducted by the Urology physicians, the practice continued. Ultimately, AGHS CEO directed the Compliance Officer to cease efforts to stop the practice.

189. ACS physicians, Dr. Paranape and Lowe, would routinely fail to be physically present at AGMC's residency surgery clinic for oversight and treatment of Medicaid patients. In these circumstances, these physicians would sign the patient's charts without having physically seen the patients.

190. While accepting Medicare patients, ACS Physicians Fenton, Papouras, and Paranjape routinely turned away Medicaid patients who wished to be seen in the physicians'

practice.   Stating the patients' coverage was "out of network", the physicians referred these patients to the AGMC surgery clinic (residency program) where they often experienced delays in receiving surgical services.

### Count I

**False Claims Act**
**31 U.S.C. §3729(a)(1)(A) & (C) (2009)**

191.    Relators reallege and incorporate by reference the allegations in the paragraphs above as though fully set forth herein.

192.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. 3729, et seq. as amended.

193.    By and through the acts described above, Respondents have knowingly presented or caused to be presented false or fraudulent claims for payment or approval.

194.    The Government, unaware of the falsity of all such claims made or caused to be made by Respondents, has paid and continues to pay such false or fraudulent claims that would not be paid but for Respondents' illegal conduct.

195.    By Respondents' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

196.    The United States is entitled to the maximum penalty of up to $11,000 for every violation alleged.

197.    By and through the acts described above, Respondents knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims. Respondents also conspired to the same as described above.

198.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Respondents, has paid and continues to pay claims that would not be paid but for Respondents' illegal conduct.

199.    By Respondents' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

200.    The United States is entitled to the maximum penalty of up to $11,000 for every violation alleged.

## Count II

### False Claims Act
### 31 U.S.C. § 3729(a)(1)(G) (2009)

201.    Relators reallege and incorporate by reference the allegations in the paragraphs above as though fully set forth herein.

202.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

203.    By and through the acts described above, Respondents have knowingly and improperly avoided an obligation to pay money to the Government, including specifically Respondents' obligation to report and repay past overpayments of Medicare and Medicaid claims for which Respondents knew refunds were properly due and owing to the United States Government.

204.    The Government, unaware of the concealment by the Respondents, has not made demand for or collected the years of overpayments due from the Respondents.

205.    By Respondents' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

206.    The United States is entitled to the maximum penalty of up to $11,000 for every violation alleged herein.

## Count III

### False Claims Act 31 U.S.C. §3730(h)

207.    Relators reallege and incorporate by reference the allegations contained in the

paragraphs above as though fully set forth herein.

208.    The violations which Relator Brouse reported to her superiors included violations of the False Claims Act 31 U.S.C. § 3729, et seq. and Federal Regulations relating to the conduct and nature of procurement when Federal monies are being expended.

209.    Relator's activity was protected activity.

210.    Respondents knew of her activity as alleged above.

211.    Her firing was in retaliation for her efforts to report and remedy the violations of the Federal False Claims Act.

212.    Under 31 U.S.C. §3730(h), there is a specific cause of action for employees, contractors, or agents disciplined or discharged for their efforts to stop violations of the False Claims Act.

213.    Relator's reporting of violations to AGHS's administrators was done to stop further violations within the meaning of this section.

214.    As a direct and proximate cause of her unlawful discharge, Brouse suffered financial loss in wages, bonuses, and benefits in a sum to be proved at trial but expected to exceed $300,000.00.

215.    Under 31 U.S.C. § 3730(h), Brouse is entitled to two (2) times back pay, interest on the back pay, and compensation for any special damages sustained because of the retaliation, including litigation costs and reasonable attorneys' fees.

WHEREFORE, Relators pray for judgment against Respondents that:

1.    Respondents cease and desist from violating 31 U.S.C. § 3729 et seq.;

2.    This Court enter judgment against Respondents in an amount equal to three times the damages the United States has sustained because of Respondents' actions, plus a

50

civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

       3.     Relator Brouse be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act and the False Claims Act;

       4.     Relators be awarded all costs of this action, including attorneys' fees and expenses; and

       5.     The United States and Relators recover such other and further relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Under Rule 38 of the Federal Rules of Civil Procedure, Relators demand a trial by jury.

Warner Mendenhall #0070165
Law Offices of Warner Mendenhall, Inc.
190 N. Union St., Ste. 201
Akron, OH  44304
(330) 535-9160; fax (330) 762-9743
warnermendenhall@hotmail.com

and

/s/ Thomas W. Connors
Thomas W. Connors #0007226
Black McCuskey
220 Market Avenue
Suite 1000
Canton, OH  44702
(330) 456-8341; fax (330) 456-5756
tconnors@bmsa.com
*Attorneys for Relators*

240828